SCHLUSSEL *v.* COMMERCIAL CASUALTY INSURANCE CO.

1. INSURANCE — BURGLARY INSURANCE — QUESTIONS OF LOSS AND VALUES FOR JURY.

    In consolidated actions on two burglary insurance policies, one covering only property kept in a safe and the other covering property located anywhere in insured's dwelling,

---

[1]Burglary and Theft Insurance, 9 C. J. § 15.

testimony as to the property stolen, both outside and in-
side the safe, what was recovered and what lost, with
cost and value thereof, *held*, sufficient to carry those issues
to the jury.

2. SAME — EVIDENCE — TESTIMONY AS TO LOSS, ALTHOUGH NOT
POSITIVE, ADMISSIBLE—WEIGHT OF EVIDENCE FOR JURY.

In consolidated actions on burglary insurance policies,
testimony by plaintiff's daughter as to articles of jewelry
which she asserted were in the safe at the time of the
burglary, although not positive and clear, was competent
to go before the jury for what it was worth.

3. SAME—CLAUSES IN POLICIES CONSTRUED MOST FAVORABLY TO
INSURED, IN AVOIDANCE OF FORFEITURE IF POSSIBLE.

Clauses in insurance policies relating to stocks of change-
able merchandise requiring insured to keep books or ac-
counts so that loss may be readily determined therefrom
by the insurer, are generally construed most favorably to
insured, in avoidance of forfeiture, if possible.

4. SAME—BURGLARY INSURANCE—COMPLIANCE WITH REQUIREMENT
TO KEEP BOOK OR ACCOUNT OF INSURED ARTICLES.

If insured kept a book or account of jewelry, as required
by a burglary insurance policy, which was stolen with the
insured articles, without participation or fault of insured,
so that he is unable to produce it, he is not thereby pre-
cluded from recovering on the policy.

5. SAME—WHETHER REQUIREMENT COMPLIED WITH QUESTION FOR
JURY.

Whether insured kept a book with a record of jewelry
owned by him, as required by the policy insuring same
against theft, which he claimed was stolen with the
jewelry, *held*, under the evidence, an issue of fact for
the jury.

6. APPEAL AND ERROR—ERROR ASSIGNED ON MOTION FOR NEW TRIAL
AVAILABLE ON REVIEW—ASSIGNMENTS OF ERROR AGAINST CHARGE.

Under 3 Comp. Laws 1915, § 12632, permitting assignment
of errors against the charge without exception, and section
12635, relative to assigning errors on decisions of the court
in refusing a new trial, where the question of error in
the court's charge in ignoring the proportionate provisions

[2]Burglary and Theft Insurance, 9 C. J. § 14 (Anno); Witnesses,
40 Cyc. p. 2195; [3]Burglary and Theft Insurance, 9 C. J. § 5;
Insurance, 32 C. J. §§ 265, 266; [4]Burglary and Theft Insurance,
9 C. J. § 8 (Anno); [5]Id., 9 C. J. § 15; [6]Appeal and Error, 3 C.
J. §§ 822, 891.

of insurance policies sued on was raised in the motion for a new trial, error may be assigned thereon in the Supreme Court, although the question of apportioning the loss between insurers, as provided for in the policies, was not directly raised on the trial.

7. INSURANCE—BURGLARY INSURANCE—PRORATING LOSS.
Where one insurance policy covered the loss by theft on the contents of insured's dwelling generally, including contents of a safe, up to $4,000, and another policy covered only the contents of the safe up to $3,000, under the provisions of said policies requiring apportionment of loss, the insurer issuing the $4,000-policy should pay the proved loss outside the safe in full up to the face of the policy, which is then reduced by the amount paid, and the remaining amount, if any, should be prorated with the $3,000-policy to pay the proved loss inside the safe.

Error to Wayne; Codd (George P.), J.    Submitted January 12, 1926.    (Docket Nos. 101, 102.)    Decided January 3, 1927.

Assumpsit by Louis Schlussel against the Commercial Casualty Insurance Company of Newark, New Jersey, and the United States Fidelity & Guaranty Company of Baltimore, Maryland, on policies of insurance.    Judgments for plaintiff.    Defendant Casualty company and plaintiff bring error.    Reversed.

*Benjamin, Betzoldt & Bassett,* for plaintiff.

*Kerr, Lacey & Scroggie,* for defendant Casualty Co.

*Payne & Payne (Thomas W. Payne,* of counsel), for defendant Fidelity Co.

STEERE, J.    Plaintiff in these two cases is a resident of Detroit, engaged in the real estate business.    His home is a two-story brick residence at 533 Ferry avenue east.    On the evening of May 5, 1922, while he and his family were away from home, attending a charity bazaar, it was broken into and entered by

---

'Burglary and Theft Insurance, 9 C. J. § 10 (Anno).

burglars who stole between $5,000 and $6,000 worth of property, consisting largely of jewelry, taking with them a safe which was kept in the hall upstairs and contained most of the property stolen.  When the family returned shortly before midnight they found burglars had entered by cutting the glass in the back door, and ransacked the house.  The shades were all drawn upstairs and the safe gone, apparently moved out to a sleeping porch and from there dropped to the ground as indicated, amongst other things, by a large hole in the ground showing where it fell.  The burglary was conceded.  It was also undisputed that a considerable portion of the property stolen, valued at $2,895, was later recovered.  Plaintiff held burglary insurance policies in the two defendant companies. Proof of loss was made, and, being unable to reach a satisfactory adjustment with them, he commenced these two actions in assumpsit by summons issued October 3, 1922.  Declaration was filed on October 21, 1922, against the Commercial Casualty Insurance Company of Newark, New Jersey, on its policy for $3,000, covering the contents of plaintiff's safe, and on January 8, 1923, against the United States Fidelity & Guaranty Company of Baltimore, Maryland, on its policy for $4,000 covering the contents of his dwelling. When the two cases were at issue and called for trial they were consolidated by order of the court and stipulation of counsel, and tried together upon the express understanding that separate verdicts and judgments might be taken and entered as to the two defendants, according as the jury might find and the court adjudge.  The trial resulted in two verdicts in favor of plaintiff, one against the Fidelity company for $1,151.74, including $132.74 interest, and the other against the Casualty company for $2,672.57, including $310.70 interest.  Separate judgments were entered upon these verdicts on February 26, 1925.  The

Casualty company then moved for a new trial on various grounds, which was denied and reasons filed. It then took proceedings to review the case on assignments of error to this court. The Fidelity company has not appealed. Plaintiff announced himself as satisfied with the aggregate amount of the verdicts as they stood, although somewhat less than the amount claimed, but the principal contention being between the two insurance companies as to whether and for what amount each was liable, plaintiff deemed it necessary to also assign error and appeal, on the contingency that the review might otherwise result in a reduction of the aggregate amount in apportionment of loss between the two companies. By stipulation between counsel filed in this court the causes have been consolidated for hearing upon all errors assigned and the two cases presented in one record.

Each of the policies directly involved here was for one year, that of the Fidelity company covered a period from February 26, 1922, to February 26, 1923, and that of the Casualty company from April 22, 1922, to April 22, 1923. The Fidelity company's policy provided residence indemnity "for all loss by burglary, theft, or larceny, of any of the property from within the house, building, apartment, or rooms occupied by the assured," described as,

|  | Ins. | Premium |
|---|---|---|
| "(a) On jewelry, precious stones, watches, articles of gold, platinum and sterling silver, furs and articles made entirely or principally of fur.. | $3,500.00 | $66.00 |

"(b) On money, securities, stamp and coin collection, to an amount not exceeding $50.00; on wearing apparel, laces, rugs, tapestries, pictures, paintings, plated ware, and all other household goods and personal

property common in residences generally but excluding (certain described property not involved here) ............... $500.00   $5.50

$4,000.00   $71.50."

It also contained the following clause:

"Other Insurance. The insurance hereunder shall not cover any article separately and specifically described and insured by the policy of any other company, underwriter or insurer. The company shall not be liable for a greater portion of any loss of or damage to property other than that separately and specifically described and insured by the policy of any other insurer or company, than the amount applicable thereto as hereby insured bears to the total amount of all valid and collectible insurance covering such loss or damage."

The policy of the Casualty company indemnified the assured,

"for all loss by burglary occasioned by the abstraction of any of such property from the interior of any safe or vault in the schedule and located in the assured's premises, or while located elsewhere after removal therefrom by burglars, by any person or persons making felonious entry into such safe or vault by actual force and violence there shall be visible marks made upon such safe or vault by tools, explosives, chemicals or electricity. * * * Subject to the following conditions:

"Exclusions. The company shall not be liable for damage therein if the books and accounts of the assured are not so kept that the company may accurately determine therefrom the actual amount of loss or damage sustained.

"Other Insurance.

"9. If the assured carries other insurance covering such loss or damage as is covered by this policy, he shall not recover from the company under this policy a larger proportion of any such loss or damage than the amount applicable thereto as hereby insured, bears to the total amount of such valid and collectible insurance."

In an annexed schedule appears:

"Item 5. The premium for this policy is $27.50.

"Item 6. The insurance wanted by this policy shall apply specifically as follows:

"Section (*a*) $2,500.00.

"For loss or damage to merchandise specified in item 10 and contained in Safe No. 1.

"Section (*c*) $500.00.     *     *     *

"Item 10. The merchandise covered hereby is fully described as follows:    Jewelry."

The three issues raised during the trial by the Casualty company and argued in its counsel's brief are there interrogatively stated as follows:

"1. What articles, if any, were taken from within the safe at the time of the burglary and not recovered and the value thereof?

"2. Did the plaintiff, in accordance with the terms of the safe policy, keep books and accounts so that the company could accurately determine therefrom the loss or damage sustained?

"3. Was the defendant Commercial Casualty Insurance Company liable, in any event, under the terms of its policy, for a larger proportion of any loss of or damage sustained to articles within the safe than the amount applicable thereto bore to the total amount of insurance represented by both of the policies of insurance issued to the plaintiff?"

Although no direct effort was made by either party to show plaintiff's financial standing, it is incidentally indicated that he was in fairly affluent circumstances and had, in the course of years, accumulated at his home in and for himself and family jewelry and other small personal articles of substantial value suggesting the wisdom of home burglary insurance.    For further protection against burglary or larceny he also provided a safe in which to store them when not worn or otherwise wanted by members of the family.    His evidence shows that much of the property insured, especially the family jewelry and keepsakes, was customarily kept locked up in the safe, though at times

temporarily taken out to wear at social functions and for other appropriate purposes.

While other members of his family had a general knowledge of what was kept there and when different things were taken out and returned, it appears that only he and a subsequently-married daughter, named Ethel Baker, who was then a member of his household and helped him in his business matters, had the combination of the safe.   They were most familiar with its contents and had special knowledge of temporary removals and returns.   The plain and but indirectly questioned testimony by members of the family, giving with detailed description as to the insured property which was stolen both from outside and inside the safe, what was recovered and what lost, with cost and value thereof, was ample to carry those issues to the jury.   A diamond expert who had cleaned and repaired some of the diamond-set jewelry also testified to its market value.

A daughter living at home named Belle testified as to the safekeeping, care and occasional use made of certain articles customarily locked in the safe and familiarity with its contents, which she detailed, stating what articles were in the safe at the time of the burglary as of her own knowledge.   On cross-examination she was asked why she testified that she knew those particular articles were in the safe, to which she replied:

"*A.* Because I knew they were in there.
"*Q.* Did you see them on that day?
"*A.* No.
"*Q.* When did you last see them in the safe?
"*A.* I don't remember what day it was."

Counsel for defendant Casualty company then asked to have all of this witness's testimony stricken out relative to what was in the safe, saying:   "Her answers show clearly she doesn't have any knowledge."

To which the court replied: "It does not show clearly. I will overrule the objection on that ground, it may stand." Reversible error is assigned and argued on this ruling. The record shows that she was further examined upon that subject and asked: "Will you state how you knew they were in the safe, if you did not see them?" To which she answered in part as follows:

"I knew they were not in use and I knew they had been put in there and they had not been taken out and I know the parties who owned them were not using them and they were in the safe at that time. I knew they were put in the safe. The last things were my mother's rings, the rest of them had been in there for some time, outside of the money which was put in there the day of the robbery. * * *

"Q. You don't know whether he (plaintiff) had been in the safe?

"A. I don't, but I know he did not. The three rings that I saw my mother put in the safe were solitaires. I know that they remained in the safe until the time of the burglary because she did not wear them. I was in the house all the time. She did not ask to have them taken out. She was busy at the Bazaar and she did not wear jewelry."

While, as the court said, her testimony does not show clearly, and as positively as she at first asserted, we think it was competent to go before the jury for what it was worth and refusal to strike her answers out was not reversible error.

It is next urged in the brief of counsel for the Casualty company that the court erred in refusing to direct a verdict in its behalf because plaintiff had not, as shown in his proof of loss, complied with the "Exclusions" provisions of its policy that he should keep his "books and accounts so that the company could accurately determine therefrom the loss or damage sustained." Upon that subject, after quoting, or reading, the provisions in the policy, the court said in his charge to the jury:

"You have heard the testimony that has been given to you along that line.    A claim has been made and an argument has been had before you by counsel for that defendant, by reason of the statement made in the proof of loss that no books of account were kept.    You have heard the testimony also of the plaintiff that he did have a list of the articles in the safe, together with his books, and that they were stolen and not recovered. If he did not have any books at the time, under the terms of this policy, there would be no liability.    It is for you to determine from all the evidence whether or not he did have these books, as I told you before, and he has testified that he did have the books and that they were stolen at the time.    Judge from the testimony as to exactly what is the fact in that regard. Did he or did he not have these books?    If he did have the books, obviously, the policy would not be void.    If he had no books, the policy would be void. That raises a square question of the fact for your determination from the evidence in this cause."

Immediately following this the court said:

"Understand that in both cases the burden of proof rests upon the plaintiff to establish by a fair preponderance of the evidence his claims against both of the defendants, or either of them."

Plaintiff, in testifying as to his loss, said he was in the safe about noon that day and spoke of "the list inside of the safe;" saying in part:

"Besides the money and jewelry in the safe I had all my papers, books, deeds, land contracts and policies. I did not get my policies and papers back.
"Q. What kind of a book did you keep in there?
"A. I had all the different things I used to put in there.    *    *    *    The book I had in the safe was like a small ledger book.    I was putting in there different things I bought.    *    *    *    whatever I bought, I used to put in that book.    *    *    *    It was a regular little book that I kept.    Jewelry I bought at different times I put in there.    It was a sort of an inventory book. This book contained a list of all the different things that were lost.    I did not get that book back.    *    *    * Whatever I bought, I used to put in that book at the

time I bought it.   I had the book about six years previous to the burglary.   *   *   *   The item in Exhibit 5 (proof of loss) 'no book record' got in there because at that time, .when they asked me, I did not have any record then.   It was gone.   I had it in the safe.   I did not have it at that time.   *   *   *   I must have told them that I had a book account in the safe that was stolen.   I did tell them that.   *   *   * I don't recall anything about it, except that I told them that I had a book with all the items listed in that was stolen."

The testimony in contradiction to this was, in substance, that, when making his proof of loss, what he said was taken by a stenographer and he then stated he had no books or records, and made no claim that any which he had previously kept were stolen with the safe.   The notary named Gibson, before whom he signed and swore to the proof of loss, was a witness for the Casualty company.   He was an insurance adjuster and investigator who had been with the firm of attorneys representing the Casualty company for about five years.   He testified that before he made out the proof of loss for plaintiff he "investigated all angles of the loss, safe and all, everything," that he filled out in the typewritten portion of the form 'he used for claims of loss the items "no book record" under the heading "book value."   Before he prepared the proof of loss he talked with plaintiff relative to books of account, could not recall the conversation very clearly, but said:

"I do recall that he had no book records of the contents of the safe.   *   *   *   I do recall that he did not inform me that he kept a set of books and that they were lost or stolen."

Supplemental to his proof of loss made in May, 1922, we find in the record an exhibit without date in the nature of a proof of loss signed by plaintiff in which he again gives a list of articles which were in the safe

substantially as before, marking those which were recovered, and concluding as follows:

"I have no written records of the articles in the safe, I can secure duplicate invoices from the people from whom the jewelry was purchased. The heirlooms were brought over from Europe over 40 years ago, and are considered priceless. Every diamond was cleaned in January, 1922, for my wife's wedding anniversary, by O. I. Baker Company, Breitmeyer building."

Although we fail to find, and counsel do not cite, any private home burglary insurance case which exactly quadrates with the situation presented here, under similar clauses in other lines of insurance largely relating to stocks of changeable merchandise in trade or business and therefore of greater significance, it is generally held that such clauses must be construed most favorably to the assured, in avoidance of forfeiture if possible, and if such books or accounts had been kept but were stolen or destroyed by fire, etc., through no participation or fault of the assured, it did not preclude him from recovery on producing the best available proof. That subject will be found instructively discussed, with citation of many authorities, in the annotations to *German Alliance Ins. Co. v. Newbern,* 28 L. R. A. (N. S.) 337 (25 Okla. 489, 106 Pac. 826). We think the question of whether or not plaintiff had kept such a book as he testified to, which without his fault was lost or stolen, became fairly an issue of fact to submit to the jury, as the court did.

The last proposition pressed in behalf of the Casualty company is that the court prejudicially erred in ignoring the proportionate provisions of the two policies in case of other insurance and charging the jury that,

"The defendant United States Fidelity & Guaranty Company is liable under its policy, I charge you as

a matter of law, only for such property or the value thereof as was outside of the safe. The defendant the Commercial Casualty Insurance Company is liable for only such property or the value thereof as was in the safe at the time."

It is urged by opposing counsel that no claim for apportionment was raised in behalf of the Casualty company during the trial, and having tried the case on other issues without even calling that proposition to the attention of the court during the trial and asking a ruling upon it, counsel is precluded from raising it here. Counsel for the appealing defendant insists that point was made and argued by him during the trial. The record does not contain the arguments of the counsel or show that question fairly presented to the court in behalf of the Casualty company either by objection, motion, or request to charge, as in fairness to the court should have been done. It was, however, plainly raised and stressed in counsel's motion for a new trial and somewhat indirectly brought to the attention of the court during the trial more than once, particularly in the last utterances of counsel just before the charge, as follows:

"*Mr. P*—(for the Fidelity company): Your honor, I move that you direct the jury to bring in a verdict against the United States Fidelity and Guaranty Company for the value of the articles stolen outside of the safe.
"*The Court:* Any objection to that being done?
"*Mr. B*—(for plaintiff): Yes, your honor, we take the position that this is a general policy and covers anything in the house. There is no exception made as to where the property should be located.
"(Argument.)
"*The Court:* I think I will grant the motion."

Under the statute which permits counsel to assign errors against the charge without exception (3 Comp. Laws 1915, § 12632) and the provision relative to assigning errors on decisions of the court in refusing

a new trial (3 Comp. Laws 1915, § 12635), counsel is not precluded from urging that assigned error here.

Plaintiff's counsel says in his brief:

"Technically, the court erred in charging the jury as set forth in plaintiff and appellant's assignments of error."

His attitude as to any apportionment of losses between policies is apparently complacent, provided it does not prevent full recovery. It may be noted that one generally recognized requisite of any rule of apportionment is that the assured shall have full indemnity according to his rights under his policies.

The puzzling question of adjustment of losses between so-called blanket, or general, and specific insurance policies has led to a variety of inharmonious decisions in different jurisdictions, mostly relating to fire insurance policies, and sometimes termed in asserted classification as the Kentucky, Connecticut, and Vermont rules. Of the latter rule it is said in *Taber* v. *Insurance Co.*, 213 Mass. 487 (100 N. E. 636, Ann. Cas. 1914A, 664) :

"This rule was adopted in this Commonwealth more than half a century ago, and more recently was applied in Vermont, and some other States."

In a general way it may be said the principles of the Vermont rule seem to have been favorably regarded and more often applied than other so-called rules of apportionment. That subject will be found interestingly discussed in *Grollimund* v. *Insurance Co.*, 82 N. J. Law, 618 (83 Atl. 1108), and the annotations to it found in L. R. A. 1915B, 509.

These two residence policies insure against burglary in plaintiff's home. As and when issued the Fidelity company's blanket policy covered this entire loss, both contents of the safe and insured property stolen from elsewhere in the dwelling. In the absence of the subsequent safe insurance it would be liable for the entire

amount, and in the absence of other insurance the Casualty company would be holden for the stolen contents of the safe only.    Both policies were issued by the same insurance agency for the defendant companies and both contain a *pro rata* clause in case of other insurance.    They cover a similar general class of valuable personal property most commonly the subject of burglary, and substantially identical as applied to this loss.    The Casualty company's policy of $3,000 covers $2,500 for loss of jewelry and $500 for loss of money and securities contained in the safe.    The Fidelity company's policy for $4,000 covers $500 in money, securities, etc., and $3,500 in jewelry, precious stones and watches, articles of gold, platinum, sterling silver, furs and other described articles of special value common in residences generally, located anywhere in plaintiff's described dwelling.    In separately and specifically describing the insured property it goes much more fully into details than the other policy.    Each provides that in case of other insurance it shall not in any event be liable for a greater proportion of any loss "than the amount applicable thereto as hereby insured bears to the total amount of all valid and collectible insurance" covering such loss.

While these policies are separate contracts with plaintiff, neither of them unqualifiedly obligated the insurer to pay him his full loss to the amount of his policy.    In those contracts he gave each the benefit of possible reduction of liability contingent upon the fact and amount of co-insurance.

We are unable to give the exempting force urged in behalf of the Fidelity company to the provision in its policy that it "shall not cover any articles separately and specifically described" by the policy of any other insurer.    Its co-insurer's policy did not separately and specifically describe or point out any specific article or thing in its policy.    It only described the class

or kind of articles it covered.   Between the two policies it was only specific in the particular that it specified the property insured must be located in the safe, and the other was distinguishable as a blanket or general policy only in the particular that it covered the insured property wherever located in the entire dwelling.

As we construe the policies under the facts shown here, we conclude and hold that the ends of justice between the co-insurers will be met and the assured receive his rightful indemnity without violence to the terms of the contract, or any inalterable *pro rata* rule, by an apportionment requiring the Fidelity company to pay the proved loss from the dwelling outside the safe in full according to the terms of its $4,000 blanket policy, which will then be reduced or exhausted to that extent, and the remaining amount of its policy prorated with the Casualty company's $3,000 specific insurance policy, those two items being the remaining total amount of collectible insurance.   The jury should have been so instructed.

The judgment is reversed, with single costs of this court to appellants and a new trial granted.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.